

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 02, 2026

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

HOLLY R.,[1]

Plaintiff,

v.

FRANK BISIGNANO,
Commissioner of Social Security,

Defendant.

No.   4:25-cv-05091-EFS

**ORDER REVERSING THE ALJ'S DENIAL OF BENEFITS, AND REMANDING FOR FURTHER PROCEEDINGS**

Due to bilateral knee pain, arthritis, chronic fatigue, foot pain, anxiety, panic attacks, depression, carpal tunnel syndrome, degenerative joint disease of the right shoulder, rotator cuff injury of the right shoulder, tendinosis of the right arm and wrist, and

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

DISPOSITIVE ORDER - 1

DeQuervain's tenosynovitis, Plaintiff Holly R. claims that she is unable to work fulltime and applied for supplemental security income benefits. She appeals the denial of benefits by the Administrative Law Judge (ALJ) on the grounds that the ALJ improperly found her headaches not to be severe at Step Two and improperly analyzed the opinions of Rikki Cook, LMHC, and David Davis-Boozler, MD; and the ALJ improperly assessed Plaintiff's credibility. As is explained below, the ALJ erred. This matter is remanded for further proceedings.

## I.    Background

In November 2019, Plaintiff filed an application for benefits under Title 16, claiming disability beginning January 1, 2019,[2] based on the physical and mental impairments noted above.[3] Plaintiff's claim was denied at the initial and reconsideration levels.[4]

After the agency denied Plaintiff benefits, ALJ Marie Palachuk held a telephone hearing in June 2022, at which Plaintiff appeared with

---

[2] This was later amended to October 15, 2019, as noted below.

[3] AR 183-194, 215.

[4] AR 88, 101, 104.

DISPOSITIVE ORDER - 2

her representative.[5]  Plaintiff and a vocational expert testified.[6]  ALJ Palachuk issued an unfavorable decision on August 19, 2022.[7] The Appeals Council denied Plaintiff's timely requested review of the ALJ's decision.[8] Plaintiff filed suit in this Court, and the Court entered judgment on April 2, 2024, finding in Plaintiff's favor, reversing the ALJ's denial, and remanding the case for further proceedings.[9] On September 24, 2024, the Appeals Council entered an Order remanding the case, consistent with this Court's judgment.[10]

On May 8, 2025, Plaintiff appeared with her attorney for a hearing before ALJ Shawn Bozarth.[11] Plaintiff and a vocational expert

---

[5] AR 36-58.

[6] *Id.*

[7] AR 15-33.

[8] AR 1-6, 176.

[9] AR 1211-1215, 1216-1258, 1259.

[10] AR 1260.

[11] AR 1155-1185.

DISPOSITIVE ORDER - 3

testified.[12]  After the hearing, the ALJ issued a decision denying benefits.[13] The ALJ found Plaintiff's alleged symptoms were not entirely consistent with the medical evidence and the other evidence.[14] As to medical opinions, the ALJ found:

- The opinions of state agency evaluators Matthew Comrie, PsyD, and Patricia Kraft, PhD, to be not very persuasive.

- The opinions of state agency physicians Robert Stuart, MD, and Gordon Hale, MD, to be not entirely persuasive.

- The opinions of consultative examiner Linda Lindman, PhD, to be not entirely persuasive.

- The opinions of David Davis-Boozler, MD, to be somewhat persuasive.

- The opinions of Rikki Cook, LMHC, to be not persuasive.[15]

---

[12] *Id.*

[13] AR 1126-1150.  Per 20 C.F.R. § 416.920(a)–(g), a five-step evaluation determines whether a claimant is disabled.

[14] AR 27-32.

[15] AR 1140-1142.

As to the sequential disability analysis, the ALJ found:

- Step one: Plaintiff had not engaged in substantial gainful activity since October 15, 2019, the date of her application.

- Step two: Plaintiff had the following medically determinable severe impairments: degenerative joint disease of the bilateral knees; patellofemoral arthritis of the right knee; degenerative joint disease of the right shoulder; carpal tunnel syndrome of the right upper extremity; status post right wrist arthroscopy; status post DeQuervain's tenosynovitis surgery of the right upper extremity; obesity; depression; adjustment disorder; and anxiety disorder.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC:  Plaintiff had the RFC to perform light work with the following exceptions:

  [She] can never climb ladders, ropes, or scaffolds. [She] can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. [She] can frequently reach and handle with her right upper extremity. [She] can have no exposure to working in high, exposed areas and moving mechanical parts. [She] can have occasional

DISPOSITIVE ORDER - 5

exposure to extreme cold, extreme heat, and vibration. [She] can understand, remember, and carry out simple instructions. [She] can perform work without a specific production rate pace, such as an assembly line or hourly production quotas as well as piece work. [She] can make simple work-related decisions. [She] can occasionally deal with changes in a routine work setting. [She] can occasionally interact with supervisors, coworkers, and never with the public.

- Step four: Plaintiff has no past relevant work.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as a routing clerk (DOT 222.687-022), marker (DOT 209.587-034), and router (DOT 222.587-038).[16]

Plaintiff timely requested review of the ALJ's decision by the Appeals Council and now this Court.[17]

---

[16] AR 1131-1143.

[17] AR 176.

DISPOSITIVE ORDER - 6

## II.  Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error,"[18] and such error impacted the nondisability determination.[19] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[20]

--------

[18] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g).

[19] *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012), *superseded on other grounds by* 20 C.F.R. § 416.920(a) (recognizing that the court may not reverse an ALJ decision due to a harmless error—one that "is inconsequential to the ultimate nondisability determination").

[20] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by

DISPOSITIVE ORDER - 7

### III.   Analysis

Plaintiff seeks relief from the denial of disability on three grounds. She argues the ALJ erred when he found headaches to be a non-severe impairment, erred when evaluating the medical opinions and erred when evaluating Plaintiff's subjective complaints.[21]  As is explained below, the Court concludes that the ALJ consequentially erred in his evaluation of the medical opinion evidence and Plaintiff's subjective complaints.

**A.   Medical Opinions: Plaintiff establishes consequential error.**

Plaintiff argues the ALJ erred in his evaluation of the medical opinions.[22]  Specifically, Plaintiff argues that the ALJ again erred in

---

the ALJ or the parties.) (cleaned up); *Black v. Apfel,* 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

[21] ECF No. 11.

[22] An ALJ must consider and articulate how persuasive she found each medical opinion, including whether the medical opinion was consistent

rejecting the disabling opinions of LMHC Cook and Dr. Davis-Boozler and in part violated the remand order previously issued by this Court. The Commissioner counter-argues that the ALJ reasonably evaluated the opinions of Dr. Davis-Boozler and LMHC Cook.[23] The Court concludes that the ALJ violated the Court's remand order by failing to consider Plaintiff's limitations during the period prior to her knee replacement surgery and the subsequent period of recovery from that surgery as a separate period of more than 12 months.

1.    Standard

The ALJ was required to consider and evaluate the persuasiveness of the medical opinions and prior administrative medical findings.[24] The factors for evaluating the persuasiveness of medical opinions and prior administrative medical findings include, but are not limited to, supportability, consistency, relationship with the

---

with and supported by the record. 20 C.F.R. § 416.920c(a)–(c); *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

[23] ECF No. 13.

[24] 20 C.F.R. § 416.920c(a), (b).

DISPOSITIVE ORDER - 9

claimant, and specialization.[25] Supportability and consistency are the most important factors,[26] and the ALJ must explain how he considered the supportability and consistency factors when reviewing the medical opinions and support his explanation with substantial evidence.[27] The ALJ may consider, but is not required to discuss the following additional factors: the source's relationship to Plaintiff such as length of the treatment, purpose of the treatment relationship and whether the source examined Plaintiff, as well as whether the source had advanced training or experience to specialize in the area of medicine in which the opinion was being given.[28] When considering the ALJ's findings, the

---

[25] 20 C.F.R. § 416.920c(c)(1)–(5).

[26] *Id.* § 416.920c(b)(2).

[27] *Id.* § 416.920c(b)(2); *Woods v. Kijakazi*, 32 F.4th a at 785 ("The agency must articulate . . . how persuasive it finds all of the medical opinions from each doctor or other source and explain how it considered the supportability and consistency factors in reaching these findings.") (cleaned up).

[28] *Id.*

DISPOSITIVE ORDER - 10

Court is constrained to the reasons and supporting explanation offered by the ALJ.[29]

### 2. Plaintiff's Testimony

At her first hearing in June 2022, Plaintiff testified that in October of 2019 she was trying to do some in-home childcare but was not able to watch children properly due to panic attacks.[30] When she got the panic attacks, it was hard to do anything.[31] Plaintiff stated that she able to complete state training in 2021 to be paid by the state to care for the children of a friend.[32] Plaintiff said that she watched her friend's one-year-old and four-year-old children on a full-time basis until her friend moved to Utah.[33] Plaintiff said that she started watching them at the friend's home but later watched them at her own home to reduce the

---

[29] *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (recognizing court review is constrained to the reasons the ALJ gave).

[30] AR 41-42.

[31] *Id.*

[32] *Id.*

[33] AR 43.

DISPOSITIVE ORDER - 11

number of panic attacks.[34]  She said that she has panic attacks four times a week.[35]

Plaintiff said that when she has a panic attack she has a hard time breathing and needs to be alone for thirty to forty-five minutes.[36] The coping techniques do not always work and half of the time she does not fully recover for an extended time.[37] She has missed appointments because she could not leave the house due to a panic attack.[38] She said that if she was watching the children when she had a panic attack she would put on a show for them and would then sit by herself and try to calm down.[39] When the children were in the room, it took longer to calm down.[40] Plaintiff said that she tried to do a day of shadowing a delivery

---

[34] *Id.*

[35] *Id.*

[36] AR 44.

[37] *Id.*

[38] *Id.*

[39] AR 45.

[40] *Id.*

DISPOSITIVE ORDER - 12

driver for Crumbl Cookies.[41] If she were to get a job as a fill-in delivery driver she would need to be able to bake, box, and deliver cookies.[42] Plaintiff thought she would be able to do the job because it had limited public contact but on her first day she had a panic attack.[43]

Plaintiff said that eight percent of the time that she leaves home she will have a panic attack so she is usually either late for her appointments or needs to cancel them.[44] She said that she needs to go home after being out for an hour.[45] Plaintiff testified that earlier in the year she had not been able to take her medication because she did not have a primary care provider and her mental health declined as a result, with her having more panic attacks.[46]

---

[41] *Id.*

[42] AR 45-46.

[43] AR 46.

[44] *Id.*

[45] AR 47.

[46] *Id.*

DISPOSITIVE ORDER - 13

Plaintiff testified that prior to her knee replacement surgery she could only stand for twenty to thirty minutes a day, but that after the surgery she was able to walk on it for up to twenty-five minutes a day and stand for longer.[47] Plaintiff said that before the surgery she could only stand for up to thirty minutes about three times a day and that after the surgery she could stand for that amount of time about six times a day.[48] She testified that it took about six months of recovery after the surgery for her to be able to stand or walk for that long.[49] Plaintiff stated that she can lift ten to fifteen pounds and that her hand will go numb if she lifts more.[50] She also said that her knee will lock or give out if she lifts more than fifteen pounds.[51] She said that when she was babysitting she would have the child crawl into her lap so she did

---

[47] AR 48.

[48] AR 48-49.

[49] AR 49.

[50] *Id.*

[51] AR 50.

not need to lift them.[52]  She said that her medication makes it hard to focus and she has a hard time focusing when she is out in public with more than three or four people.[53] She said that when she has a panic attack it is hard to concentrate on anything.[54] She said that sometimes she cannot focus for the whole day and needs to lie down for about forty-five minutes to rest due to low energy.[55]

### 3.    Relevant Medical Records

#### a.    *Physical impairments*

##### i.    *Trios Health*

On March 12, 2019, Plaintiff presented to ARNP Joshua Anderson, requesting a new referral for insurance purposes to Dr. Jacob Stanfield for her knee.[56] On examination, Plaintiff reported that she stopped seeing her psychiatrist due to personality conflict and was

---

[52] *Id.*

[53] AR 51.

[54] *Id.*

[55] AR 52.

[56] AR 342.

recently experiencing depression and anxiety with fatigue.[57] She was in no acute distress and was ambulating normally.[58] She was diagnosed with pain in her right knee and major depressive disorder.[59]

On March 28, 2019, Plaintiff presented to ARNP Anderson with complaints of injury to her left wrist after tripping and falling.[60] On examination, she was ambulating normally, was in no acute distress, and had tenderness to palpation over the left distal ulna.[61] An x-ray indicated no fracture.[62]

On May 13, 2019, Plaintiff presented to ARNP Anderson with acute pharyngitis.[63] On examination, she had muscle ache, muscle weakness and pain in her right shoulder with abduction and

---

[57] *Id.*

[58] *Id.*

[59] AR 342-343.

[60] AR 340.

[61] *Id.*

[62] AR 345.

[63] AR 336.

circumduction, and was tender on palpation and was painful with abduction and extension beyond 90 degrees or with any circumduction.[64]

On September 3, 2019, Plaintiff presented to Adam Smith, DO, at Trios Health for an annual OB-GYN exam.[65] On examination, Plaintiff reported hot flashes as well as knee pain and the need for a knee replacement.[66]

### ii.    Kadlec Orthopedic

On December 13, 2018, Plaintiff presented to Doyle Miller, MD, with complaints of progressively worsening pain in her right knee.[67] She reported constant aching with a stabbing pain rated at a 9 out of 10, and swelling and locking of the knee.[68] Plaintiff also reported that the

---

[64] AR 338.

[65] AR 331.

[66] AR 333.

[67] AR 407.

[68] *Id.*

DISPOSITIVE ORDER - 17

pain was worse at night.[69] On examination, Plaintiff was anxious with dysphoric mood and sleep disturbance, and had tenderness to the medial joint line and medial patellar facet.[70] All results were within normal limits other than tenderness in the patellar region.[71]  Plaintiff was sent for an MRI of the right knee, which revealed advanced degeneration of the patellofemoral compartment with full-thickness chondral loss; large knee-joint effusion; and degenerative free edge fraying of the lateral meniscal body.[72] Plaintiff was diagnosed with right knee degenerative joint disease (DJD) with severe patellofemoral arthritis.[73] Dr. Miller advised that Plaintiff should not have arthroscopic surgery due to her age but should attempt to manage the

---

[69] *Id.*

[70] AR 408-409.

[71] *Id.*

[72] AR 408-409.

[73] AR 409.

condition with conservative treatment and get a total knee replacement if her pain persisted.[74]

On March 13, 2019, Plaintiff presented to Jacob Stanfield, MD, following an injection.[75] Plaintiff reported continued severe pain as a result of her "significant patellofemoral osteoarthritis."[76] Dr. Stanfield noted that Dr. Miller felt arthroscopic surgery would not be beneficial and noted that on examination Plaintiff experienced tenderness in the medial joint line, medial retinaculum, lateral retinaculum, and Plica.[77] Dr. Stanfield thought that Plaintiff would be a good candidate for knee replacement but should exhaust conservative treatments such as injections and radiofrequency ablation due to her age.[78]

---

[74] *Id.*

[75] AR 410.

[76] *Id.*

[77] *Id.*

[78] AR 411.

On March 17, 2019, Plaintiff underwent an intracapsular lidocaine injection to the right knee performed by Arash Motagi, DO.[79] On examination, Plaintiff's gait was antalgic.[80] Plaintiff was diagnosed with chronic pain in her right knee "due to significant amount of degeneration and arthritis in her right knee."[81] Dr. Motaghi noted that Plaintiff had tried conservative therapies with minimal relief and he recommended a right knee genicular nerve block, as doctors were attempting to postpone knee replacement due to Plaintiff's age.[82] On May 15, 2019, Plaintiff returned to Dr. Motaghi, reporting only mild relief from the nerve block performed.[83]Dr. Motaghi assessed Plaintiff with chronic pain of the right knee and opined that she received eighty-

---

[79] *Id.*

[80] AR 415.

[81] *Id.*

[82] *Id.*

[83] AR 416-417.

DISPOSITIVE ORDER - 20

percent relief from the genicular nerve blocks.[84] Dr. Motaghi suggested that Plaintiff should undergo radiofrequency ablation.[85]

On June 10, 2019, Plaintiff presented to Dr. Stanfield reporting that her recent radiofrequency ablation had given her only minimal relief and that she needed a steroid injection in her knee.[86] On examination, Plaintiff had tenderness at the medial joint line, medial retinaculum, lateral retinaculum, and Plica.[87] Dr. Stanfield administered an injection and assessed her as suffering from primary osteoarthritis of the right knee.[88] He opined that Plaintiff was young for a knee replacement surgery but it was likely her only option due to significant degenerative changes in her knee.[89] Dr. Stanfield recommended that Plaintiff try to manage symptoms for as long as

---

[84] AR 420.

[85] *Id.*

[86] AR 421.

[87] *Id.*

[88] AR 422.

[89] *Id.*

DISPOSITIVE ORDER - 21

possible before scheduling the knee replacement.[90] On September 11, 2019, Plaintiff presented to Dr. Stanfield seeking an injection for her right knee.[91] On examination, Plaintiff exhibited pain and crepitus with motion.[92]  Dr. Stanfield noted that Plaintiff had attempted injections, radiofrequency ablation, bracing, and anti-inflammatories, as well as physical therapy but had not gotten relief.[93] Because pain symptoms were interfering with her activities of daily living, Plaintiff was seeking permanent treatment.[94] Dr. Stanfield noted that conservative measures had failed and that he had counseled against knee replacement if possible, but symptoms were severe and conservative measures were not helpful, so knee replacement would be considered in the summer.[95]

---

[90] *Id.*

[91] AR 422-423.

[92] AR 423.

[93] AR 424.

[94] *Id.*

[95] AR 425.

### iii. Dr. Davis-Boozler

On January 24, 2021, Plaintiff was examined by David Davis-Boozler, MD, at the request of the Commissioner.[96] Dr. Davis-Boozler noted that he reviewed the records of Dr. Stanfield from June 10, 2019, and December 18, 2019.[97] Plaintiff reported that she had bilateral knee pain which progressed over the last two to three years, and that she had a right knee replacement and later a manipulation under anesthesia.[98] She also reported left foot pain due to a ganglion cyst and chronic fatigue for the past twelve months.[99] Plaintiff reported that she lived with her three children and ran a babysitting service, and was able to do such activities as cooking, cleaning, shopping, and yard work.[100] On examination, Plaintiff's blood pressure was elevated; she was appropriately dressed and showed no unusual habits or distress; she

---

[96] AR 850-856.

[97] AR 851.

[98] Id.

[99] AR 852.

[100] Id.

had a normal gait and was able to rise from a chair and the table without help; Plaintiff could walk on her heels and toes, balance, bend and squat halfway; straight leg testing was negative; motor function and strength were normal in all extremities; range of motion was normal in all extremities with the exception of limited flexion in the knees; and sensory examination was normal in all extremities.[101] Dr. Davis-Boozler diagnosed Plaintiff with bilateral knee pain with good prognosis; left foot pain with good prognosis; and chronic fatigue with good prognosis.[102]

An X-ray of the left foot taken on January 26, 2021, indicated no acute injury.[103]

    4.    <u>Analysis</u>

        *a.*    *<u>The ALJ's consideration of Dr. Davis-Boozler's opinion regarding  Plaintiff's ability to stand</u>*

---

[101] AR 853-855.

[102] AR 855.

[103] AR 857.

DISPOSITIVE ORDER - 24

Dr. Davis-Boozler examined Plaintiff at the request of the Commissioner on January 24, 2021.[104] Dr. Davis-Boozler conducted a fairly thorough examination and reviewed treatment records from Dr. Stanfield which documented a total knee replacement in Plaintiff's right leg.[105]

Dr. Davis-Boozler assessed that Plaintiff is capable of walking at least four hours, has no limitation in sitting, does not need an assistive device, and can lift twenty pounds occasionally and ten pounds frequently.[106] He listed the following postural limitations: no climbing or balancing and occasional stooping, kneeling, crouching, and crawling.[107] He opined that Plaintiff had no manipulative limitations and no environmental limitations.[108] With regard to the limitation to sitting, Dr. Davis-Boozler noted that the four-hour limitation to sitting

---

[104] AR 850-856.

[105] *Id.*

[106] AR 855.

[107] AR 855-856.

[108] AR 856.

DISPOSITIVE ORDER - 25

might increase or relax based upon Plaintiff's recovery from right knee arthroplasty.[109]

The ALJ found Dr. Davis-Boozler's opinion somewhat persuasive and in doing so stated the following reasoning:

> Additionally, the undersigned considered the opinion of the internal medicine consultative examiner, David Davis-Boozer, M.D., and finds it somewhat persuasive. Dr. Davis-Boozer examined the claimant and opined that the claimant can stand at least four hours and that this may change either to increase or relax this restriction based on future development of the flexibility of her right knee arthroplasty. He further opined that the claimant had no sitting limitations, did not require an assistive device, could lift and carry 20 pounds occasionally and 10 pounds frequently, and could occasionally stoop, kneel, crouch, and crawl (Exhibit 13F). Dr. Davis-Boozer's opinion appeared to be generally supported by his examination of the claimant. For instance, the claimant had a normal gait, rose from a chair unassisted, tandem walked, and squatted halfway. The claimant also had normal range of motion of all joints other than limited flexion of her knees and had normal motor strength other than 4/5 strength in the right lower extremity. However, the opinion is not entirely consistent with the evidence of record as a whole. Dr. Davis-Boozer examined the claimant in January 2021, eight months after the claimant had undergone her right knee arthroplasty and he acknowledged that the claimant could stand and walk at least four hours and may be able to stand and walk more depending on how she further healed. As mentioned above, the evidence has not shown the claimant to have sought out or to have

---

[109] AR 855.

received medical treatment for her knee impairments since prior to this examination (Exhibit 11F/6). Accordingly, the evidence does not demonstrate a further decline in her knee functioning or that healing did not continue to take place. The claimant also had a normal gait and no motor or sensory deficits in records from June 2022 (Exhibit 23F/247). She similarly was noted to have a normal gait and station in April 2024 records (Exhibit 24F/88). Therefore, the undersigned does not any specific limitations to be warranted in regard to the claimant's ability to stand and/or walk. The undersigned also notes that the claimant has developed right upper extremity impairments since Dr. Davis-Boozer examined the claimant (Exhibits 22F/60-65; 23F/1, 6, 37, 123, 126, 132, 188, 191). The undersigned has fully considered the effects of these impairments in forming the above listed residual functional capacity. Accordingly, Dr. Davis-Boozer's opinion is only somewhat persuasive.[110]

As the Court noted in its prior Order, Dr. Davis-Boozler was a consultative examiner who examined Plaintiff and rendered opinions at the request of the Commissioner. As an experienced consultant for the Administration, he was familiar with the regulations and policies and was aware that the exertional limitations of light work required standing or walking for six hours. He did not opine that Plaintiff was capable of standing and walking for six hours. Dr. Davis-Boozler stated clearly that Plaintiff was not fully recovered from her right knee

---

[110] AR 1141.

DISPOSITIVE ORDER - 27

replacement and that at the time of her examination she could reasonably be expected to be able to stand and/or walk for "at least" four hours, indicating that the ability to stand or walk for longer periods was not clear pending recovery.

The ALJ's reasoning is flawed because he failed to properly consider Dr. Davis-Boozler's opinion in the context of Plaintiff's recovery period following her right knee replacement as well as the period prior to Plaintiff's surgery. While the ALJ is correct that the records indicate that Plaintiff's function improved following her right knee replacement, they also show that prior to the surgery she was quite limited. A claimant's improvement with treatment is "an important indicator of the intensity and persistence of . . . symptoms."[111] Symptom

---

[111] 20 C.F.R. § 416.929(c)(3). *See Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

improvement, however, must be weighed within the context of an "overall diagnostic picture."[112]

The ALJ erred by discounting both Plaintiff's symptom reports and Dr. Davis-Boozler's opinions regarding her ability to walk for the entire alleged disability period. The record does not show that Plaintiff's symptoms regarding her right knee improved until at the very least seven months after her surgery, and if Dr. Davis-Boozler's opinion is to be given full-credit, even as of January 2021 Plaintiff had not improved to the extent that she could engage in light work.

The record evidence that for a period prior to her surgery and for at least nine months thereafter, Plaintiff's ability to stand and walk was significantly limited.  Because the ability to engage in a full range of light work would require Plaintiff to stand and walk for a period of up to six hours per day, the limitation would be disabling. While Dr. Davis-Boozler has opined to limitations consistent with an inability to work at

---

[112] *Holohan v. Massanari*, 246 F.3d1195, 1205 (9th Cir. 2001); *see also Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995) ("Occasional symptom-free periods ... are not inconsistent with disability.").

greater than the sedentary level of exertion, it is unclear at what date those limitations started and on what date they ended or were expected to end.

The Court concludes that remand is warranted for the ALJ to properly consider the opinion evidence to evaluate the record, and to obtain medical expert testimony or opinion as to Plaintiff's limitations throughout all relevant periods, including the period preceding Plaintiff's surgery and the period of recovery immediately following it.

5.    Summary

Because the ALJ did not give good reasons for his evaluation of the medical opinions of Dr. Davis-Boozler, and failed to develop the record as to Plaintiff's limitations pre-surgery and post-surgeical recovery, a remand is warranted for development of the record.

**B.    Plaintiff's Subjective Complaints:  Plaintiff establishes consequential error.**

Plaintiff argues the ALJ failed to properly assess her subjective complaints.  The Court concludes that for the later period beginning January 9, 2023, to date, the ALJ failed to properly develop the record as to medical opinion evidence regarding Plaintiff's shoulder injuries

DISPOSITIVE ORDER - 30

and failed to consider the consistency of Plaintiff's testimony regarding her limitations in reaching with the medical evidence in the record.

1.    Standard

When examining a claimant's symptoms, the ALJ utilizes a two-step inquiry. "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."[113] Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if [the ALJ] gives 'specific, clear and convincing reasons' for the rejection."[114] General findings are insufficient; rather, the ALJ must identify what symptom claims are being discounted and what evidence undermines these claims.[115] "The

---

[113] *Molina*, 674 F.3d at 1112.

[114] *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (quoting *Lingenfelter*, 504 F.3d at 1036).

[115] *Id.* (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), and *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (requiring the

DISPOSITIVE ORDER - 31

clear and convincing standard is the most demanding required in Social Security cases."[116] Therefore, if an ALJ does not articulate specific, clear, and convincing reasons to reject a claimant's symptoms, the corresponding limitations must be included in the RFC.[117]

### 1.    Plaintiff's Testimony[118]

At her second hearing,  Plaintiff testified that she graduated high school and had been self-employed in 2021 and 2022 watching a friend's

---

ALJ to sufficiently explain why he discounted claimant's symptom claims)).

[116] *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

[117] *Lingenfelter*, 504 F.3d at 1035 ("[T]he ALJ failed to provide clear and convincing reasons for finding Lingenfelter's alleged pain and symptoms not credible, and therefore was required to include these limitations in his assessment of Lingenfelter's RFC.").

[118] This summary focuses on Plaintiff's testimony during the second hearing, as the Court finds that the ALJ failed to consider Plaintiff's

two children but had to stop.[119] She has a driver's license and drives to medical appointments or the grocery store but prefers for her daughter or husband to drive her.[120] She will either have her daughter go with her to shop or will order from Walmart to be picked up but does not do shopping.[121] Plaintiff said that she lives with her husband and her four children aged 18, 13, 12, and 11.[122] She said that she makes sure the three younger children get fed and drives them to school but her older daughter drives them home.[123] She will only attend events sometimes due to anxiety in crowds.[124]

---

subjective complaints regarding limitations in the use of her right arm and upper extremity.

[119] AR 1158-1159.

[120] AR 1159.

[121] AR 1159-1160.

[122] AR 1160.

[123] *Id.*

[124] *Id.*

Plaintiff said she is 5'6" and 218 pounds and that she is right-handed.[125] She walks with a crutch prescribed by her doctor several weeks prior due to a sprained ankle.[126] On April 8, 2025, she had a debridement procedure of her right shoulder and was scheduled for a consultation for rotator cuff surgery.[127] Prior to the debridement she was not able to move her shoulder at all.[128] Plaintiff said she had issues with reaching and that even doing a puzzle was difficult.[129] She said that with regard to her hand she could open a car door, use keys, use a knife and fork, and "sometimes could open a jar.[130] She said she could shave and comb her hair but that shaving her upper arms was difficult because she could not lift her right arm.[131] She said that she wears a

---

[125] AR 1161.

[126] *Id.*

[127] AR 1161-1162.

[128] AR 1162.

[129] *Id.*

[130] *Id.*

[131] AR 1162-1163.

splint or hand brace to help with use of her right hand and takes ibuprofen for pain.[132] Plaintiff said she also has knee pain but does not get treatment because she has learned to elevate her leg as needed and would be consulting with her doctor in two weeks about her leg because she injured it when she recently fell.[133] She said that before she fell she elevated her leg but not as often.[134]

Plaintiff testified that she is seeing a therapist and taking psychiatric medications benzoaxazine, Lamotrigine, buproprion, and buspirone.[135] She said that she suffers from depression, anxiety and panic attacks but has not been hospitalized psychiatrically.[136] She said that she can groom herself, can feed the children and sometimes clean but at times cannot.[137] She can take medication by using a phone

---

[132] AR 1163.

[133] AR 1163-1164.

[134] AR 1164.

[135] AR 1165.

[136] *Id.*

[137] AR 1166.

reminder and has no hobbies, but will walk for a block.[138] Plaintiff said she has childhood friends who she talks to and texts via phone and that she will attend the first hour of church on Sunday.[139]

Plaintiff testified that her knee pain has worsened, and she cannot always stand or walk for 20 to 30 minutes as she used to.[140] She said that if she stands or walks for more than 20 minutes she will need to elevate her leg above waist level for 20 to 30 minutes to stop swelling.[141] On a bad day she elevates her leg 3 to 5 times.[142] She said that her most recent shoulder surgery was the fifth surgery to her right arm/shoulder.[143] She said that 2 to 3 days a week she has tension headaches from using her shoulder and will need to lay down for about

---

[138] *Id.*

[139] AR 1167.

[140] AR 1168.

[141] AR 1169.

[142] *Id.*

[143] AR 1170.

DISPOSITIVE ORDER - 36

40 minutes.[144] In January 2025, she started to get double vision when she had her headaches.[145] She had a brain MRI that was normal and the double vision resolved.[146]

Plaintiff testified that she could use her hands for about 20 minutes before her hand tingles and she will get tension headaches.[147] She then needs to rest her hand for 30 minutes before she can use it again.[148] She said that she can reach for between 1 minute and 5 minutes before she has to stop and that if she is working at the counter she has the same restriction.[149] She can lift a gallon of milk with her right hand and can lift about 10 to 15 pounds with her left hand. And if she lifts more it will affect her neck and shoulders.[150] She said that she

---

[144] AR 1170-1171.

[145] AR 1171.

[146] *Id.*

[147] AR 1173.

[148] *Id.*

[149] AR 1173-1174.

[150] AR 1174.

mainly cooks crockpot meals because it is easier.[151] Her children and husband have to sweep, clean the bathroom, and do laundry because she cannot do those tasks.[152]

Plaintiff testified that she at times misses appointments or is late due to anxiety because she needs to take about 20 minutes to calm herself when she is getting anxious.[153] She gets anxiety attacks about 2 to 3 times week and can stay out of the house for about 45 minutes before going home but it leaves her exhausted.[154] She was unable to watch her friend's children when her friend wanted her to watch them in the friend's home instead of her own home.[155] Plaintiff testified that her medications make her tired and she will at times nap for 2 hours during the day.[156]

---

[151] AR 1174-1175.

[152] *Id.*

[153] AR 1175-1176.

[154] AR 1176.

[155] AR 1177.

[156] AR 1178.

## 2. Relevant Medical Records

On January 9, 2023, Plaintiff presented to ARNP Gloria Olsson.[157] Plaintiff reported that she had been experiencing wrist pain in her right wrist since January 4, 2023, when she went bowling and thought she had aggravated a pre-existing carpal tunnel syndrome.[158] On examination, there was tenderness along the lateral wrist.[159] ARNP Ollson ordered an x-ray of the wrist and prescribed a brace.[160] On January 12, 2023, Plaintiff returned to discuss the x-ray results and reported that her pain was unchanged.[161] ARNP Olsson noted that the x-ray indicated ossification along the area of pain.[162]

---

[157] AR 1455.

[158] *Id.*

[159] AR 1455.

[160] *Id.*

[161] AR 1456.

[162] AR 1457.

On April 14, 2023, Plaintiff presented to ARNP Olsson and Etasha Bhatt, MD, with continued pain.[163] On examination, Plaintiff had exquisite tenderness to palpation along the extensor carpi ulnaris (ECU) tendon in the wrist, pain in the fovea, and clicking in the wrist.[164] An MRI taken the same day showed tendinosis and edema at the ECU proximal to the ulnar styloid, partial tear of the triangular fibrocartilage (TFCC), as well as a small ganglion cyst.[165] On May 11, 2023, Plaintiff presented for follow-up, with treatment notes indicating that she had undergone a right wrist arthroscopy with debridement of the TFCC, and right ECU debridement and stabilization after an April MRI had indicated ECU inflammation with calcific tendinitis, and a central TFCC tear.[166] Dr. Bhatt noted that Plaintiff continued to experience diffuse pain and was going to be transitioned from her current splint over the course of six weeks to a less restrictive splint for

---

[163] AR 1730.

[164] AR 1730.

[165] AR 1731-1732.

[166] AR 1729.

DISPOSITIVE ORDER - 40

another 8 weeks and was advised not to flex her wrist.[167] Range of motion could not be evaluated due to postop state but sensation to light touch was intact.[168]

At a June 9, 2023 follow-up, Dr. Bhatt notes that Plaintiff had been attending physical therapy and working on hand therapy but her progress was slow.[169] At her PT appointment on June 28, 2023, Plaintiff reported continued hypersensitivity on the dorsal hand.[170] At a July 7, 2023, follow-up Dr. Bhatt noted that braces were being discontinued and that he advised Plaintiff that her recovery from the procedure was expected to be very slow.[171] On August 2, 2023, Plaintiff complained of pain and hypersensitivity through the dorsal hand.[172]

---

[167] AR 1729.

[168] *Id.*

[169] AR 1714.

[170] AR 1707.

[171] AR 1701.

[172] AR 1689.

On October 5, 2023, Plaintiff presented to Joshua Bales, MD, with complaints of continued right wrist pain over the dorsal radial aspect.[173] On examination, Plaintiff had a positive Finkelstein's test, and was diagnosed with DeQuervain's synovitis.[174] Plaintiff wished to try conservative treatment.[175] On November 13, 2023, Dr. Bales noted that conservative treatment, including injections, had failed and surgical release was necessary.[176] On November 28, 2023, Plaintiff underwent surgery and presented on December 12, 2023, for her first post-op visit.[177]

In April 2024, Plaintiff presented to the Emergency Department of Kadlec Regional Medical Center, with reports that she had injured her right hand.[178] An x-ray of the right hand showed cortical irregularities

---

[173] AR 1668.

[174] AR 1670-1671.

[175] *Id.*

[176] AR 1667.

[177] AR 1660.

[178] AR 1638-1639.

most prominent in the 2nd to 5th digits and appearing progressed from prior examinations.[179] At a May 16, 2024 follow-up, Plaintiff reported continued pain of a mild to moderate severity.[180]

On August 6, 2024, Plaintiff presented to ARNP Monica Mendoza with complaints of ongoing tingling and pain in her right shoulder.[181] Plaintiff reported that the symptoms started 2 months prior and worsened over time, and were affecting her ADL's such as brushing her hair.[182] On examination, Plaintiff's right shoulder was tender and she had a positive Hawkin's and empty can test on the right shoulder.[183] ARNP Mendoza suspected a rotator cuff injury and referred Plaintiff to physical therapy with a scheduled follow-up in 4 weeks.[184] At a follow-up appointment on September 9, 2024, Plaintiff reported that her right

---

[179] *Id.*

[180] AR 1623.

[181] AR 1488.

[182] AR 1489.

[183] AR 1489-1490.

[184] AR 1488.

DISPOSITIVE ORDER - 43

shoulder pain persisted despite physical therapy.[185] On examination, her shoulder had decreased range of motion behind her back and with overhead motion.[186] An MRI taken on September 20, 2024, indicated as follows:

> 1. Moderate supraspinatus and infraspinatus tendinosis without a discrete high-grade tear.
> 2. Focal intermediate signal intensity in the distal supraspinatus tendon measuring 0.4 cm in AP diameter is favored to represent focal insertional tendinosis. A small intrasubstance tear cannot be entirely excluded but is felt to be less likely.
> 3. Focal T1/T2 signal hypointensity in the posterior fibers of the infraspinatus tendon insertion measuring 0.4 cm, suggestive of calcific tendinitis.
> 4. Small focal articular surface tear in the cranial fibers of the subscapularis tendon insertion, superimposed on mild tendinosis.
> 5. Mild tendinosis of the intra-articular long head of the biceps tendon.
> 6. Moderate to severe degenerative changes of the acromioclavicular joint.
> 7. Trace fluid in the subacromial-subdeltoid bursa, which can be seen in the setting of bursitis.

---

[185] AR 1492.

[186] AR 1493.

On March 3, 2025, Plaintiff presented to orthopedist Jason Dutton, DO, of Kadlec Clinic Northwest.[187] Dr. Dutton noted that Plaintiff was complaining of problems with the right shoulder persisting for 6-7 months despite having 2 injections in her shoulder and a round of physical therapy.[188] Dr. Dutton noted that Plaintiff's prior surgeries included a right knee joint replacement in 2008, left carpal tunnel release in January 2015, right carpal tunnel release in February 2015, right need radio ablation procedure in May 2019, right knee joint replacement in May 2020, right knee joint manipulation and injection in July 2020, a right wrist arthroscopy with debridement of the extensor carpi ulnar tendon in April 2023, and a right wrist DeQuervain's release in November 2023.[189] On examination, Dr. Dutton noted tenderness to palpation on the front part of the shoulder over the Ac joint and along the occipital groove, had abduction to 165 degrees with pain, and had a positive speed test, O'Brien's test, Hawkins test, and

---

[187] AR 1542.

[188] *Id.*

[189] AR 1542-1543.

Neer's test.[190] An MRI taken that same day indicated findings similar to those found on September 20, 2024.[191]

Dr. Dutton diagnosed tear of the right rotator cuff, arthralgia of right acromioclavicular joint, and biceps tendinitis of the right upper extremity.[192]  He recommended a right shoulder diagnostic arthroscopy with rotator cuff repair.[193]

3.    The ALJ's Reasoning Regarding Plaintiff's Subjective Complaints

The ALJ articulated the following reasoning regarding his consideration of Plaintiff's subjective complaints regarding her right upper extremity:

> Next, the undersigned considered the claimant's right shoulder and right upper extremity impairments but finds that the medical evidence does not fully support the extent of the claimant's subjective allegations.[194]

---

[190] AR 1545.

[191] AR 1546.

[192] AR 1546.

[193] AR 1547.

[194] AR 1137.

The ALJ went on to recite that at her consultative examination in January 2021, Plaintiff did not complain of any issues affecting her upper extremities but that in January 2023 she reported right wrist pain and was diagnosed with tendinosis in April 2023 after an MRI was taken; that she underwent an arthroscopy in and reported doing well until she developed numbness over the ulnar nerve in September 2023; that in 2023 Plaintiff was diagnosed with DeQuervain's tenosynovitis in November 2023 and underwent surgery, but still had tenderness post-surgery; that in August 2024, Plaintiff complained of right shoulder pain and was found after examination to be suffering from a rotator cuff tear causing pain and reduced range of motion; that in November 2024, a nerve conduction text indicated incomplete healing of Plaintiff's carpal tunnel syndrome; and that in March 2025 it was noted that Plaintiff continued to suffer from right shoulder pain and limitation of motion following injection and a debridement procedure.[195]

The ALJ went on to state:

---

[195] AR 1137-1138.

DISPOSITIVE ORDER - 47

The undersigned has accounted for the full effects of the claimant's right shoulder and right upper extremity impairments, in combination, in including the limitations to frequently handle and reach with the right upper extremity and in the inclusion of having only occasional exposure to hazards, extreme temperatures, and vibration.[196]

He also reasoned:

In evaluating the claimant's symptoms under SSR 16-3p, the undersigned finds the evidence only partially supports the alleged loss of functioning. As indicated above, the medical evidence showed the claimant to have experienced improvement after undergoing her knee procedures (Exhibits 8F/20; 11F/8; 13F). The evidence has not shown the claimant to have sought out or to have received medical treatment for her knee impairments since approximately 2020 (Exhibit 11F/6). Additionally, although the claimant has reported having difficulties with her right upper extremity, she also testified at the May 8, 2025 hearing that she is able open a car door, use utensils, use keys, drink from a glass, shave, comb her hair, and make grocery lists. As for her mental impairments, despite the claimant testifying that she wants to stay in bed, she also testified that she takes her children to school daily, prepares meals for them, attends to her personal hygiene, and that she attends religious services weekly (Hearing Testimony).[197]

---

[196] AR 1138.

[197] AR 1139.

DISPOSITIVE ORDER - 48

4.    Analysis

It is of note that among Plaintiff's listed severe impairments are four separate impairments affecting the use of Plaintiff's dominant right upper extremity.[198] Yet, there is no medical opinion contained in the record regarding Plaintiff's limitations in the use of her dominant extremity, despite the fact that in the two year prior to the hearing she had undergone 5 separate surgeries to her hand, wrist, and shoulder.

"The ALJ always has a special duty to fully and fairly develop the record" to make a fair determination as to disability, even where, as here, "the claimant is represented by counsel."[199] This "affirmative responsibility to develop the record" is necessary to ensure that the ALJ's decision is based on substantial evidence.[200]

On this record, without a treating or examining medical opinion, the Court "cannot conclude that the ALJ's decision was based on

---

[198] AR 1132.

[199] *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) (cleaned up).

[200] *Id.* at 1184.

substantial evidence . . . [when taking] the totality of [the claimant's] conditions into account."[201]

As noted, the ALJ must identify what symptom claims are being discounted and clearly and convincingly explain the rationale for discounting the symptoms with supporting citation to evidence.[202] This

---

[201] *Id.*

[202] *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022). Factors to be considered by the ALJ when evaluating the intensity, persistence, and limiting effects of a claimant's symptoms include: 1) daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; 6) any non-treatment measures the claimant uses or has used to relieve pain or other symptoms; and 7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c),

requires the ALJ to "show his work" and provide a "rationale . . . clear enough that it has the power to convince" the reviewing court.[203]

There is no indication that the ALJ has medical training which would allow him to interpret the raw medical data and make his own medical assessment of the functional limitations following Plaintiff's surgery.[204] Yet, the ALJ has articulated that a limitation to frequent handling and reaching is sufficient to account for Plaintiff's severe impairments without explanation as to how, for instance, such a limitation is consistent with the expected symptoms of a rotator cuff tear. The ALJ has not explained how he arrived at his conclusions when

---

416.929(c); *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014); Soc. Sec. Rlg. 16-3p, 2016 WL 1119029, at *7.

[203] *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022) (alteration added).

[204] ALJs cannot usurp the role of doctors when interpreting medical evidence, particularly highly technical medical evidence. *Trevizo v. Berryhill*, 871 F.3d 664, 683 (9th Cir. 2017).

DISPOSITIVE ORDER - 51

formulating the RFC.  Instead, he offered a conclusory opinion of the expected limitations.[205]

### 5.    Summary

Again, the Court concludes that remand is warranted to develop the medical record and orders that the ALJ be directed to schedule a consultative examination to obtain a medical opinion as to the limitations in Plaintiff's use of her right upper extremity, and to call a medical expert to testify as to the expected physical limitations from Plaintiff's arm and shoulder in addition to those of her knee. Specifically, the Court directs that the medical expert opine as to whether there was any period of twelve months or more during which Plaintiff's limitations would have precluded light and/or sedentary work.

As discussed above, the ALJ failed to consider the medical record as a whole when considering the medical opinions.  Because the Court has remanded the case for consideration of the record as a whole, the

---

[205] *See Garrison v. Colvin*, 759 F.3d 995, 1013-14 (9th Cir. 2014).

ALJ will be required to consider the credibility of Plaintiff's subjective complaints.

## C.    Step Two:  This issue is moot.

Because the Court has remanded the case for further development of the record, all of Plaintiff's physical impairments, including headaches, will be reconsidered.  Accordingly, this issue is moot.

## D.    Remand for Further Proceedings

Plaintiff submits a remand for payment of benefits is warranted. The decision whether to remand a case for additional evidence, or simply to award benefits, is within the discretion of the court."[206] When the court reverses an ALJ's decision for error, the court "ordinarily must remand to the agency for further proceedings."[207]

---

[206] *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing *Stone v. Heckler*, 761 F.2d 530 (9th Cir. 1985)).

[207] *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017); *Benecke*  379 F.3d at  595  ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation");

The Court finds that further development is necessary for a proper disability determination. Here, while it appears clear that Plaintiff suffered disabling limitations, it is not clear when those limitations became disabling or were expected to improve to a point they were no longer disabling. Therefore, the ALJ should schedule a consultative examination and call a medical expert to testify as to Plaintiff's physical limitations, properly consider the opinion evidence, and make findings at each of the five steps of the sequential evaluation process.

## IV.   Conclusion

Accordingly, **IT IS HEREBY ORDERED**:

1.   The ALJ's nondisability decision is **REVERSED**, and this matter is **REMANDED** to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

---

*Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014).

DISPOSITIVE ORDER - 54

2.    The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 11 and 13**, enter **JUDGMENT** in favor of **Plaintiff**, and **CLOSE** the case.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

DATED this 2nd day of March 2026.

_____
EDWARD F. SHEA
Senior United States District Judge